# Charleston.

## WILLIAM FLUHARTY *vs.* JEREMIAH BEATTY.

### January Term, 1871.

1. In a bill in equity it is alleged that, a lot of land belonging to B., is sold by judgment creditors; that he became the purchaser and applied to F. to become his surety in the purchase money bonds; that it was agreed between them that F. should appear as principal in the bonds, and B. as surety, and the land, with the advice and consent of the commissioners of sale, should be reported as sold to F., which is accordingly done. That it was also further agreed that if B. paid the purchase money the land should be his, and if not, and it became necessary for F. to pay it, the land should become his. That B. paid all the purchase money and lifted the bonds, except 100 dollars, which F. paid without the consent of B; that B. retained possession of the property. That subsequently F. obtained from the commissioners a deed for the land, without the knowledge of B., and had never, up to that time, expressed any intention of retaining the land or claiming it. And that B. had tendered to F. the 100 dollars and its interest, and a properly prepared deed to be signed by him, conveying the land to B. The bill seeks a conveyance from F. HELD:

    I. That the allegations of the bill, if true, furnish a case that a court of equity would not hesitate to enforce by compelling a conveyance; and a demurrer to it, for want of uncertainty and mutuality in the contract, will not lie.

    II. The proofs sustain the allegations of the bill in this case.

    III. That as nothing appears in the record to show that the property sold for less than its value when purchased by B., on account of the arrangement between him and F., or that the creditors of the former did not receive the benefit of the proceeds of the sale, it cannot be objected that it was such a fraudulent arrangment by B. to cover up his property in fraud of his creditors, who do not appear to be injured and are not heard to complain, as will prevent his enforcing the agreement.

2. The decree below, in this case, declared the 100 dollars paid by F. to be a lien on the land, and also ordered a deed to be made by him to B., without requiring as a condition precedent the payment of the 100 dollars and interest; and it is held that, inasmuch as the money and interest had been once tendered and refused, and it was declared to be a paramount lien, the fact that the deed is required to be made without the payment thereof as a condition precedent, is not sufficient cause to reverse the decree.

Bill filed in the circuit court of Marion county, at May rules, 1868, by Jeremiah Beatty against William Fluharty and wife. It alleged that in 1859, the plaintiff owned a lot of ground in Mannington; that a chancery suit was pending against him, instituted by sundry judgment creditors, and the lot was decreed to be sold; that he was under pecuniary embarrassments and desired to purchase the lot to prevent its being sacrificed, and did so at the sale—being the highest bidder, for the sum of 400 dollars; that fearing his ability to purchase at the sale, by reason of not being able to give the security for the purchase money, he agreed with the defendant that the sale should be reported in the name of the defendant, and accordingly executed bonds jointly with him for the purchase money; that it was also agreed that if the plaintiff was unable to pay the bonds, and the defendant should have to pay them, then the deed should be made to him; otherwise, if the plaintiff paid the bonds the deed for the property should be made to the latter; that this arrangement was entered into to secure the defendant if he should be compelled to pay the bonds. That in July, 1860, the sale was confirmed by a decree of court, and the commissioners were directed to make a deed to the defendant. That the plaintiff, in fact, subsequently paid all the purchase money except 100 dollars, which latter sum was paid by the defendant; that the defendant did not express any wish to keep the property, or claim it to be his own, but alleged that he had 100 dollars in his possession and was afraid that it would be taken from him by United States soldiers, and desired as a favor to himself to be permitted to pay the 100 dollars for the purpose of put-

ting it beyond danger.  That plaintiff refused the permission to pay the same, but the defendant did pay it to the commissioners who made the sale, without the knowledge or consent of the plaintiff.  That plaintiff moved to Wood county, and neglected to make any effort to get a deed for the lot, and was ignorant of the fact that the defendant could get a deed from the commissioners without plaintiff's consent, but the latter did, in July, 1867, procure a deed from the commissioners without the knowledge or consent of the plaintiff.  That the plaintiff had been and still was in possession of the property with the knowledge of the defendant, and had with like knowledge erected valuable improvements on the lot, to the extent of 700 dollars, and that the defendant had made no claim to the lot to the time of his procuring the deed, and did not do so until about April, 1868, when for the first time the plaintiff derived information of a deed having been obtained.   The bill charged that the deed had been fraudulently obtained; that the defendant was seeking a wrongful possession of the lot, and refused to make the plaintiff a deed for it, although plaintiff had tendered the payment of the 100 dollars and its interest, and demanded a deed, producing to the defendant at the same time a properly prepared deed, with covenants of special warranty, ready to be signed.  That the money and its interest was brought into court ready for the defendant.  It asked that the defendant be required to execute a deed to the plaintiff for the lot, &c.

The answer denied the agreement concerning the purchase of the lot as set up in the bill, but averred that prior to the sale thereof, the plaintiff bought of defendant some cattle and assigned in payment thereof a note on McDougal and Conaway for the sum of 232 dollars, due in August, 1858, but not due at the date of assignment; that the plaintiff represented the prommissors to be solvent; that when the note became due they were not so, but were notoriously insolvent, and still remained so; of which fact the plaintiff had knowledge; by reason of which insolvency the plain-

tiff became liable to pay the amount of the note to the defendant. That the plaintiff was in failing circumstances and believed to be insolvent at the time of the purchase, and was still of doubtful solvency; that the plaintiff suggested and stated that the defendant should purchase the lot, and in that way he could realize the amount of the note, and that the plaintiff would pay the purchase money as it became payable, and that he would also pay defendant the 232 dollars with its interest, in a reasonable time after the sale. That in view of the doubtful solvency of the plaintiff and to secure the payment of the 232 dollars, he authorized the plaintiff to bid the land in for him at the sale, if defendant was not present thereat; that defendant voluntarily agreed with plaintiff, that if the purchase money was paid by the latter, and also the amount of the McDougal note with its interest, that the plaintiff should have the land, and not otherwise. That the allegations of the bill as to the payment of the 100 dollars by the defendant were false; that the plaintiff himself took the money to the commissioner from the defendant, and executed his receipt therefor, stating what was to be done with it; (which was filed with the answer.) That the agreement was only a verbal one and ought not to be enforced in equity, as the plaintiff had failed to comply with it. That in 1865 the plaintiff went to defendant and acknowledged his indebtedness of the 232 dollars, and asked for the note of McDougal to see if it could not be collected, and defendant gave it to him on his executing a receipt therefor, (which was filed with the answer and stated that it was to be given to a lawyer for collection or returned to defendant,) and which had not been collected or returned. The answer also averred that defendant believed that inasmuch as the plaintiff was largely indebted, more than he could pay, at the date of the sale, in desiring and agreeing with the defendant about the purchase of the lot, he was seeking to cover up his property to delay, hinder and defraud his other creditors; and therefore did not come into court with clean hands; that

the plaintiff was allowed to occupy and possess the land as a matter of favor under the hope that he would pay the defendant according to the contract.

The testimony of John E. Wells, taken for the plaintiff, proved that the defendant went to the plaintiff in 1864, and wanted to loan him 100 dollars, which he refused; he wanted him to take it and make him secure in it; he gave as a reason that he was afraid the money would be stolen from him; that his guns had been taken from him; that during the war he took for one of the parties, (could not recollect which) 100 dollars to. Thomas G. Watson, one of the commissioners who sold the land, at Fairmont, and saw him enter a credit on some paper; whoever gave him the money gave it to him as the money of the defendant, and thought it was the latter who gave it to him.

The depositions of three witnesses were also taken for the plaintiff, who proved the value of the improvements put upon the property to be from 500 to 700 dollars.

The plaintiff's own deposition proved that a few days after the sale, he went to the defendant to get him to go his security in the purchase money bonds; that the next day thereafter the defendant went to the plaintiff and agreed to go his security; and it was also agreed that if the plaintiff could pay for the land he was to have it; otherwise, if he could not it was to be the property of the defendant. Subsequently it was agreed that the defendant should go first in the bonds for the purchase money, inasmuch as the plaintiff was "enthralled," and it was thought that if he went first it might be the grounds of controversy in the future; that they went to Fairmont together, the plaintiff paying the defendant's expenses in travelling; that commissioner Watson recommended the arranging of the report of sale in the name of the defendant; that defendant was not present at the sale; did not know when it occurred; that there never was any other contract in relation to the matter than that just given; that the contract had been frequently talked of between the parties, and the plaintiff had always

told defendant he intended to pay the bonds and keep the land; that about the 5th of April, 1866, commissioner J. O. Watson (substituted for T. G. Watson, deceased,) received from the plaintiff all the balance of the purchase money, and delivered to him the bonds in the presence of the defendant and with his consent; that upon its being mentioned that the defendant claimed to have paid 100 dollars in the bonds, that he got the commissioner to make a calculation of the interest thereon, from the date of its payment, whereupon the parties got the commissioner to draw an instrument of writing between them, the purport of which was when the plaintiff paid the 100 dollars and its interest to the defendant, the latter was to direct the court to make the deed for the land to plaintiff, or if the latter failed and his son paid the money, the defendant was to direct the deed to be made to the son; that the defendant was to sign this agreement, and took it with him. He also proved the tender of 100 dollars and interest, and the prepared deed, as alleged in the bill. He also corroborated the evidence of Wells as to the offer of the defendant to loan plaintiff money in 1864, and his refusal to take it; and that the receipt he gave therefor was written after Wells had paid the money to the commissioner, but dated back to cover the time of his doing so; that the defendant never made any claim to the property until 1868.

The deposition of G. W. Glendenning, taken by the plaintiff, proved that in 1864 or 1865, he went to defendant to see about buying the property in controversy; that he said in reply to a question that he had no claim against it except a lien of 100 dollars; and that defendant told witness, at same time, that plaintiff had paid his expenses to Fairmont and back, when they went to sign the bonds; that defendant also stated that he once had an intention of buying the property of the plaintiff, but had concluded not to do so, and that witness would be perfectly safe in buying of the plaintiff.

The deposition of commissioner James O. Watson, taken

by plaintiff, proved that on the 5th of April, 1866, the parties came to him to lift the bonds, and that the plaintiff paid him the balance of the money due thereon; witness understood from them that the 100 dollars credited on the bonds had been paid by defendant, and a conversation took place between them concerning a deed for the property which was to be made to the plaintiff or his son; that upon the suggestion of witness a paper was drawn by him directing the court to make a deed to plaintiff or his son, which was to be signed by defendant, who took the paper. Witness did not recollect any more of the contents of the paper.

The testimony taken by the defendant related principally to the actual value of the property and its rental value, and to the insolvency of the prommissors in the McDougal note, but as this latter feature of the testimony does not appear to have been considered by this court, it is unnecessary to give it here. The deposition of the defendant proved substantially the averments of the answer, but does not appear to have been corroborated by any other testimony.

The court below at the March Term, 1869, decreed that the plaintiff was entitled to a conveyance of the land from the defendant, with covenants of special warranty; that the 100 dollars paid by defendant was a lien thereon, with interest from the date of its payment, and that the defendant should make a deed to the plaintiff within sixty days from the rising of the court. It also gave costs to plaintiff; but without prejudice to the defendant in any proceeding for the recovery of the 232 dollars and interest mentioned in the answer.

Fluharty appealed to this court.

*A. F. Haymond* for the appellant.

*James Morrow, jr.,* for the appellee.

The first error complained of is, that the contract or arrangement set up in the bill, or as the same is disclosed upon

a consideration of the bill, answer and testimony, is void within the Statute of Frauds.

In reply it is insisted: That this case does not, in any part or aspect of it, disclose a "contract for the sale of real estate," and therefore does not answer to any description of contract required to be in writing. See Code 1860, ch. 143; Browne on Fraud, sec. 263.

The contract or arrangement between the parties is, in legal effect, the declaration of a trust. It was agreed that the appellant should have and retain the legal title within his control, as a security—the parties contemplating the possibility that he might have to pay the purchase money notes. This view of the case is sustained by the testimony of the appellee, corroborated most fully by the testimony of the witness Glendenning, by the circumstance that the appellant always recognized the appellee as the owner of the property, acquiesced in the latter's possession, claiming it as his own, for seven years, and by the testimony of the appellant himself—or rather by his failure to controvert the testimony of the appellee in regard to the terms and conditions upon which he (the appellant) was to sign the memorandum, or writing, drawn by the witness, James O. Watson, on the 5th day of April, 1866. Beatty explicitly swears that this memorandum, or writing, was to be signed by Fluharty upon payment to him of 100 dollars, with interest from the 10th day of May, 1864, (the time said sum was paid by Fluharty); and the latter, though his testimony was taken subsequently to Beatty's, fails to deny that he was to sign said memorandum on said condition, viz: When Beatty should pay him one hundred dollars, with its interest.

The legal title was never to become vested in Fluharty, except in the contingency that Beatty should fail to pay the purchase money. It was therefore a purchase made by Beatty himself, for his own use, and Fluharty's relation to the transaction was a relation of trust and confidence. See *Bank of the U. S.* v. *Carrington*, 7 Leigh 566—the opinions of

all the judges; also Story's Eq. Jur., sec. 1201; *Boyd* v. *McLean*, 1 Johns. Chy. Rep., 582.

In this State a declared trust may exist. without writing, and may be established by parol. Declarations of trust are not, in this State, required to be in writing. We have not adopted the 7th section of the English Statute of Frauds. See *Bank of the U. S.* v. *Carrington et als.*, *supra:* particularly the opinions of Brooke and of Tucker, Justices, and the cases there cited. See also the Statute of Frauds, 29, Car. 11, chap. 3, sec. 7, in Browne on the Statute of Frauds— appendix.

But if any writing or memorandum had been necessary to relieve the transaction from the operation of the Statute of Frauds, it is insisted that the writing drawn by the witness, James O. Watson, on the 5th of April, 1866, was sufficient, when taken in connection with Beatty's subsequent offer to comply with the condition on which it was to be signed, and Fluharty's wrongful and fraudulent refusal to sign it. Beatty tendered the money upon payment of which Fluharty was to execute said writing. Beatty swears what the conditions were, on which that writing was to be signed. Fluharty makes no attempt to deny it.

Fluharty shall have no advantage of his own fraud in refusing to sign said paper. 5 Vin. Abr., 523, 524; *Crooke* v. *Higgins*, 7 Conn. Rep., 342; Browne on Fraud, secs. 441, 442, 443, 444, 445, 445 a.

But if this could not be sustained as a declared trust, the facts proven constitute a good foundation from which to infer a resulting trust. For even if Fluharty were in fact the purchaser at the commissioner's sale, yet Beatty, having paid the purchase money, (for the 100 dollars was merely paid to Beatty's use); having put valuable improvements upon the land with Fluharty's constant knowledge; having occupied it as his own for seven years, always claiming it as his own, with a full and continued recognition by Fluharty of such possession, payment, improvement, and claim of ownership, the law will imply a trust in Beatty's favor.

*Letcher* v. *Letcher's heirs*, 4 J. J. Marshall, 592; *Boyd* v. *Mc-Lean*, 1 Johns. Chy. Rep., 482; *Botsford* v. *Burr*, 2 Johns. Chy. Rep., 409; 2 Story's Eq. Jur., sec. 1201; *Bank of U. S.* v. *Carrington et als., supra.*

Resulting trusts are expressly excepted from the operation of the Statute of Frauds. See sec. 8, Statute of Frauds, and 7 Leigh, 566, *supra.*

But even if it were, as contended, a contract for the sale of lands, and therefore within the provisions of the Statute of Frauds, yet there was such a partial performance by Beatty, coupled with his exclusive possession for seven years, and the erection of valuable improvements, all with the constant knowledge of Fluharty, together with the latter's express disclaimer of title, and his constant recognition, express as well as implied, of Beatty's title, as completely withdraws the case from the operation of the Statute, and entitles Beatty to a conveyance. Browne on Frauds, secs. 448, 465, 466, 467, 480 to 490; *Harris* v. *Crenshaw*, 3 Rand., 14; 3 Story's Rep., 182; 9 Peters, 86; 14 Johns. 15; *Park-hust* v. *Van Cortlandt*, 14 Johns., 14; *Jenkins* v. *Eldridge*, 3 Story's Rep., 182; 9 Peters, 86; 4 Wall., 513.

2d. It is claimed that the arrangement between these parties was a fraudulent contrivance to cover up Beaty's property, and that therefore the circuit court erred in lending its assistance to carry out the arrangement, or to relieve either party.

In reply it is admitted that where two or more engage in a fraudulent transaction to injure another, neither law nor equity will relieve them, as against each other, from the consequences of such misconduct. But no such condition of facts is presented by this case. There is nothing to show, either that any person was injured, or that any injury was intended, in the transaction.

The property was sold for all it would bring, and Beatty's creditors received all the money. His design no doubt was, to preserve an opportunity of redeeming the property, which instead of being an injury to creditors, is always to their

advantage, as in this very case. Beatty has either paid, or is able to pay, all his debts. No injury could have been intended, because none resulted to any of his creditors, while obvious benefits did result to them.

If the motive and design of an act may be traced to an honest and legitimate source, equally as to a corrupt one, the former ought to be preferred. 4 Peters, *supra.*

An act legal in itself, will not be affected by the motive which superinduced it. 24 Howard, 407; 3 Wall., 461.

Fraud and injury must both concur to furnish ground for the interposition of a court of equity. That is to say, equity cannot recognize fraud where no injury has resulted. *Clark et al* v. *White*, 12 Peters, 178.

It does not appear that the proceeds of the sale (four hundred dollars) were insufficient to pay all Beatty's creditors. He withdrew no money from the reach of his creditors for the purposes of the purchase; for there was no money in hand required by the terms of the sale, and none, in fact, paid by Beatty for six years. It is impossible not to see that none of Beatty's property was "covered up" by this transaction. There was no secrecy about it. The arrangement was made known to Thomas G. Watson, one of the commissioners who made the sale. The possession remained with Beatty. He continually called the property his. Fluharty and everybody else recognized the property as Beatty's. There was no pretence at any time that the property was Fluharty's. The whole transaction was held out, by both parties, in its real character. There was nothing merely colorable about it. In this respect it is essentially different from the case of *Stark's executors* v. *Littlepage*, 4 Rand. 369. In that case the parties kept up a pretence for twenty years that the slaves belonged to Stark. At the time of the sale under execution, Littlepage paid for them with his own money—thus making a secret investment of so much money to which his creditors were entitled. There were the solemn admissions under the hand of Littlepage, continuing through a period of twenty years, that the slaves

were Starke's. In the case at bar, a precisely opposite state of facts exists. The suggestion of fraud is repelled by the circumstances of the transaction.

Fraud and injury must concur in order to furnish ground for judicial action. *Clark et als.* v. *White*, 12 Peters, 178.

There must be contrivance and design to injure. *Conrad* v. *Nicoll*, 4 Peters, 295.

Moreover, he who alleges a fraud must prove it. The allegation of fraud contained in the answer is not responsive to any thing contained in the bill; is therefore mere pleading—mere matter of defense—and must be proved. 2 Stew., 280; 8 Pick., 113; 2 McCord's Ch. Rep., 156; *Paynes* v. *Coles et al.*, 1 Munf., 373; 1 Gill & Johns., 272; 2 Green's Ch. Rep., 357

3d. It is assigned for error, that the decree of the circuit court does not require Beatty to pay Fluharty the sum of 232 dollars, with interest from August 4th, 1857; being the price of certain cattle, in payment whereof the former assigned to the latter a certain note on McDougal & Conaway for 250 dollars, with the understanding that, out of the proceeds, when collected, the sum of 18 dollars should be repaid to Beatty.

It is to be observed that this transaction, and all the allegations relating to it, are pleaded as matters of defense; are not responsive to the bill; and their truth, or falsity, must, therefore, be determined by the preponderance of testimony. *Hart* v. *Ten-Eyck*, 2 Johns. Ch. Rep., 305.

Since the enactment of the law making a party a competent witness in his own behalf, it is no doubt the rule in chancery that the allegations of the answer, even when responsive to the bill, will be overcome by the testimony of the complainant, superadded to that of one other witness.

If the allegation of the bill be true, that the contingency upon which the commissioner was to convey the property to Beatty was the payment by him of the purchase money, then the decree does not contain the error complained of.

In support of this allegation there is the full and explicit

testimony of Beatty himself, and the clear and conclusive testimony of the witness Glendenning, corroborated by the nature of the transaction and by circumstances.

It is extremely improbable that Beatty should, in 1860, agree to become absolutely liable to Fluharty for the payment of the McDougal & Conaway note, and yet the note should still remain in the possession of Fluharty, and that he should continue to be recognized by both of them as its rightful holder, authorized and legally obliged to use diligence to collect it. If Beatty, at any time, assumed absolute liability for the payment of the amount of the note, he thereupon became reinvested with the title, and with the right to possession of it; yet as late as 1865, Fluharty claims and controls the note for all purposes. He sends it by Beatty to a lawyer for collection; requires a written acknowledgment and agreement to return the note, if not so left; and then takes from the hand of Beatty the attorney's receipt in whose hands it was left for collection; promising, from time to time, to return Beatty's receipt, which, however, he fails to do; and then most disingenuously, and, indeed, whilst suppressing the truth, tries to leave the impression that Beatty has the note or the money. All of which, it is submitted, is utterly inconsistent with the pretension that Beatty had undertaken, absolutely, to pay the note; or that he had undertaken any liability in respect of it, other than that which appertained to him as endorser.

The fourth error assigned is, that the circuit court erred in directing Fluharty to convey to Beatty, without requiring Beatty to pay him the said sum of 100 dollars, with interest from May 10th, 1864.

It is sufficient to reply that Beatty's right to conveyance became absolute as soon as he tendered the said hundred dollars with its interest. His right no longer remained subject to qualification or condition, and is precisely the same that it would have been if Fluharty had accepted the money when tendered. Fluharty shall not, by his own act,

and without the consent, and against the will of Beatty, be allowed to qualify or limit the latter's rights.

A decree, such as contended for, would be ineffectual: Beatty could only obtain a deed upon payment of 100 dollars, &c., to Fluharty. But the latter's declared intention is that he will not receive it, and that intention is presumed to continue. He has his lien upon the land, and, being for money that can be traced into the land, it is superior to every other lien. He can enforce this lien in equity whenever he chooses. His wrongful refusal to accept the money and make the deed, shall not be allowed to procure him any advantage. The court did enough in securing him a sum of money which he had been tendered, and which he refused to take.

Beatty, having done all that he could do, shall not be prejudiced by the act of Fluharty.

The tender of payment invests him with every right which he could have had, in case it had been accepted.

He again makes tender of the money in his bill, placing it at the disposal of the circuit court. That court will, on application of Fluharty, order it to be paid to him. There is, therefore, no reason why resort should be had to this court. The decree of the circuit court correctly ascertains and declares the *rights* of the parties, and gives the appellant ample security for a sum of money which the appellee has placed within the power of the court. Beatty goes into court to enforce an equity, but he must make his equity perfect before instituting his suit. His tender of the money perfects his equity. It is wholly different from a tender of money in payment of a sum acknowledged to be due, in order to change the legal relations of the parties and save the debtor from costs, or to afford him a remedy for the malicious prosecution of a suit for money which he had offered to pay without suit. The tender, in this case, was to perfect an equitable title, which before that time was conditional or contingent, but which, upon tender made, became absolute and perfect. Prior to the tender, Beatty

had only the *jus ad rem* in respect of the real estate in controversy; after the tender, he had the absolute *jus in re*, and no doubt was entitled to a conveyance of the land discharged of the lien reserved in the decree.

BERKSHIRE, *President.*

The first question to be disposed of in this case, is the demurrer to the bill. It is claimed that the demurrer should have been sustained as to the defendant William Fluharty, upon the ground of uncertainty and want of mutuality in the contract, as alleged and set out in the bill; while on the other hand, it was insisted, on behalf of the appellee, that such a case was shown, either as an oral contract, with part performance, or as a declared or resulting trust, as would require a court of equity to enforce it.

It is not deemed essential to enter upon an inquiry as to which class the present case properly belongs. For whether it be assigned to the one or the other, the allegations of the bill, if true, furnish a case that a court of equity, it seems to me, would not hesitate to enforce, by compelling a conveyance, by the appellant to the appellee, of the property in controversy.

The question then arises, are the allegations of the bill sustained? It seems to me they are, in every material respect, and that the testimony in the cause fully sustains the appellee's version of the transaction.

In the first place it is evident that the relation subsisting between the appellant and appellee, after the sale of the lot in question under the decree, at the suit of Beatty's creditors, was not that of *landlord and tenant.* The evidence and circumstances forbid that, and it is not so claimed by the appellant.

In the next place it is proved explicitly by James O. Watson, at the time Beatty paid the last of the purchase money, that he or his son was to have a deed for the property upon the payment to Fluharty of a certain sum then unpaid, and that he (Watson) prepared a writing to that effect, and gave

it to Fluharty, which he was to sign, when such amount was paid to him. But Watson is silent as to the amount that was to be settled by Beatty on account of the failure of his memory.

Fluharty and Beatty each testified in his own behalf. Fluharty states that Beatty was to pay, in addition to the 100 dollars which he (Fluharty) had paid of the purchase money on the lot, the further sum of 232 dollars, which he claimed Beatty owed him for a lot of cattle, purchased some years before the sale of the lot in controversy. This is denied by Beatty, who swears that he was to have a deed, upon the payment of the purchase money on the lot; and further, that he does not owe, and is not liable to pay the 232 dollars. Fluharty is not supported by other testimony; while Beaty is sustained by the witness Glendenning. It is not, therefore, made to appear satisfactorily, that the 232 dollars was any part of, or in any wise connected with the purchase of the lot, or that Beatty ought, in fact, to pay it. It was argued that Beatty ought not to be entertained in a court of equity, because the transaction between him and Fluharty is shown to be a fraudulent arrangement to cover the former's property in fraud of his creditors. Nothing, it appears to me, is disclosed by the record to sustain the proposition. It is not claimed that the property sold for less than its value, on account of the arrangement between Fluharty and Beatty, or that the creditors of the latter did not receive the benefit of the proceeds of the same. Nor does it appear that the creditors of Beatty were in any manner injured thereby, or that they were ever heard to complain of the transaction. And it is not perceived how the fact of Beatty's purchasing in the property, improving and enhancing its value, and claiming it as his own, without any attempt to conceal it from his creditors, could be to *their* prejudice, nor upon what principle Fluharty could be heard to make such objection here.

The remaining objection urged against the decree is, that Fluharty is required to convey the property in dispute to

Beatty without requiring, as a condition precedent, the payment of the 100 dollars and the interest still due from the latter on the purchase money.

It cannot be doubted that the circuit court might very properly have done so, but as the debt is made entirely secure and is a paramount lien on the property, and as it was once tendered to and *refused* by Fluharty, and might be again refused if tendered, I do not think the objection to the form of the decree in this respect is sufficient to require reversal.

Upon the whole, I think the decree complained of ought to be affirmed, with costs and damages.

The remaining members of the court concurred.

DECREE AFFIRMED.